UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

DAVID BARNETT,                          )
                                        )
            Plaintiff,                  )        Civil Action No. 3:20-cv-337-CHB
                                        )
v.                                      )
                                        )        **MEMORANDUM OPINION AND**
FIRST NATIONAL BANK OF OMAHA,           )        **ORDER**
                                        )
            Defendant.                  )
                                        )
                                        )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant First National Bank of Omaha's ("FNBO")

Motion for Summary Judgment, [R. 31]. Plaintiff David Barnett filed a Response, [R. 32]. FNBO

filed a Reply, [R. 35]. This matter is now ripe for review. For the reasons stated below, FNBO's

Motion for Summary Judgment will be denied in part and granted in part.

I.      **Background**

On or about March 7, 2014, Barnett applied for and received a FNBO credit card account

ending in 9550 ("Account"). [R. 31, p. 5, ¶ 1; R. 31–1, Ex. A, p. 2, ¶ 5]. When applying for the

Account, Barnett provided FNBO his cellular number as a way for FNBO to contact him. [R. 31,

p. 5, ¶ 2; R. 31–2, Ex. B, p. 4 at 12:22–13:4]. In 2019, Barnett was allegedly unable to make his

minimal monthly payments because he was off work due to a bilateral knee replacement. [R. 31,

p. 5, ¶ 3; R. 31–2, Ex. B, p. 4 at 13:5–25; R. 32, p. 6]. As a result, FNBO started to contact

Barnett, via its telephone system LiveVox, to discuss his missed payments, which totaled around

$122.00 and grew to $757.52. [R. 31, pp. 5–6, ¶¶ 4, 6, 9; R. 31–2, Ex. B, p. 4 at 13:22–25; R. 32,

p. 6; R. 32–10, Ex. 10]. Over a seven-month period, FNBO contacted Barnett, via phone call,

text message, or prerecorded message, 574 times—an average of 3.2 times a day (excluding Sundays). [R. 32, p. 6; R. 32–11, Ex. 11, p. 19, 18:10–11; R. 32–13, Ex. 13]. On several occasions, Barnett instructed FNBO to mail him his billing statements and appeared to hang up on FNBO representatives. [R. 31, p. 5, ¶¶ 4–6; R. 31–2, p. 5 at 20:6–24]. He also testified he instructed them, at some point, to stop calling him. [R. 32–3, pp. 3–4, 14:17–15:2].

On May 13, 2020, Barnett filed a Complaint in this Court, alleging three counts. In Count I, Barnett asserts FNBO violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227; in Count II, he claims FNBO violated the Kentucky Consumer Protection Act ("KCPA"), Ky. Rev. Stat. § 367.170; and in Count III, he brings an intrusion upon seclusion claim. [R. 1, pp. 5–7, ¶¶ 38–48]. FNBO filed a Motion for Summary Judgment, [R. 31], on July 26, 2021. Barnett responded, [R. 32], and FNBO replied, [R. 35].

## II.     Standard of Review

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When determining a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). The Court may not "weigh evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265 (1986). The Court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

The moving party bears the initial burden of showing there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies

this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* at 324. When, as here, the defendant moves for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Where "a party fails to support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat the fact as undisputed. FED. R. CIV. P. 56(e)(2). A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

### III.  Analysis

#### A.  The Telephone Consumer Protection Act

In 1991, Congress enacted the TCPA "to address certain telemarketing practices that [it] found to be an invasion of consumer privacy." *LaGuardia v. Designer Brands, Inc.*, No. 2:20–cv–2311, 2020 U.S. Dist. LEXIS 199262, at *21 (S.D. Ohio Oct. 27, 2020) (citing *Zehala v. Am. Express*, No. 2:10–cv–848, 2011 U.S. Dist. LEXIS 109697, at *10 (S.D. Ohio Sep. 26, 2011)); *see also* Telephone Consumer Protection Act, Pub. L. No. 102–243, 105 Stat. 2394. Specifically, the law imposes restrictions on telemarketers' abilities to make calls with an "automatic telephone dialing system" ("ATDS") *or* an artificial or prerecorded voice. *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167, 1173 (2021). Under the TCPA, it is illegal to use an ATDS or an

artificial or prerecorded voice to make a call to, among other things, a cell phone without the called party's prior consent. 47 U.S.C. § 227(b)(1)(A).

The TCPA defines ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* at § 227(a)(1). Violations of the TCPA may result in penalties of $500 for each illegal call. *Id.* § 227(b)(3)(B).  If the caller "willfully" or "knowingly" violated the prohibition, the court may award up to $1,500 per call. *Id.* § 227(b)(3). The Sixth Circuit treats text messages as calls under the TCPA. *See Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 371 (6th Cir. 2015) ("We thus unhesitatingly afford deference to the [Federal Communications Commission's] holding that a text message should be treated as a 'call' for purposes of the TCPA.").

"To prevail on a TCPA claim, a plaintiff must prove four elements: that [he] '1) received a call; 2) on a cellular line for which the called party is charged for the call or on a residential telephone line; 3) using ATDS equipment or an artificial prerecorded voice; and 4) made without prior consent and not for emergency purposes.'" *Hill v. Universal Fid., L.P.*, No. 5:16–cv–02957, 2018 U.S. Dist. LEXIS 84086, at *12 (N.D. Ohio Apr. 26, 2018) (quoting *Reo v. Caribbean Cruise Line, Inc.*, No. 1:14–cv–1374, 2016 U.S. Dist. LEXIS 35596, at *9 (N.D. Ohio Mar. 18, 2016)); *see also Pugliese v. Prof. Recovery Serv.*, No. 09–12262, 2010 U.S. Dist. LEXIS 64111, at *19 (E.D. Mich. June 29, 2010). Here, the first and second elements are not in dispute. Instead, the bone of contention lies with elements three and four.

### i.  ATDS *or* an Artificial Prerecorded Voice

As mentioned above, the TCPA defines an ATDS as a piece of equipment with the capacity to both "store or produce telephone numbers to be called, using a random or sequential

number generator," and to dial those numbers. 47 U.S.C. § 227(a)(1). Recently, the Supreme Court decided whether that definition included "equipment that can 'store' and dial telephone numbers, even if the device does not 'us[e] a random or sequential number generator.'" *Duguid*, 141 S. Ct. at 1167. The Court decided in the negative, holding that "[t]o qualify as an [ATDS], a device must have the capacity either to store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator." *Id.*

To contact its customers, FNBO utilizes a telephone system called LiveVox. [R. 31, p. 6, ¶ 9]. FNBO claims LiveVox does not fit the definition of ATDS as defined under the TCPA and *Duguid*, since the telephone system can neither store telephone numbers using a random or sequential number generator nor produce telephone numbers using a random or sequential number generator. *Id.* at 11; *see also* [R. 31–1, Ex. A, p. 3, ¶ 15; R. 31–4, Ex. D, p. 3, ¶ 5]. Instead, on any given day, LiveVox only calls customers from a predetermined list, which is ordered and provided by FNBO. [R. 31, p. 11]; *see also* [R. 31–1, Ex. A, p. 3, ¶¶ 12–14].

In response, Barnett argues that LiveVox is an ATDS because (1) "[it] may use a random or sequential number generator to determine the order in which to dial phone numbers contained in a preproduced list," and (2) it has the *capacity* to store telephone numbers using a random or sequential number generator. [R. 32, pp. 12–15]. In support of his first argument, Barnett relies on footnote 7 in *Duguid*—specifically, the bolded line below. In full, footnote 7 provides the following:

> Duguid argues that such a device would necessarily "produce" numbers using the same generator technology, meaning "store or" in §227(a)(1)(A) is superfluous. "It is no superfluity," however, for Congress to include both functions in the autodialer definition so as to clarify the domain of prohibited devices. *BFP* v. *Resolution Trust Corporation*, 511 U. S. 531, 544, n. 7, 114 S. Ct. 1757, 128 L. Ed. 2d 556 (1994). **For instance, an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list. It would then store those numbers to be dialed at a later time.** See Brief for

Professional Association for Customer Engagement et al. as *Amici Curiae* 19. In any event, even if the storing and producing functions often merge, Congress may have "employed a belt and suspenders approach" in writing the statute. *Atlantic Richfield Co.* v. *Christian*, 590 U. S. ___, ___, n. 5, 140 S. Ct. 1335, 206 L. Ed. 2d 516 (2020)).

141 S. Ct. at 1175 n. 7 (emphasis added).

Recently, a plaintiff presented an argument identical to Barnett's to the Eastern District of Michigan, relying on the same emphasized line above. *See Barry v. Ally Fin., Inc.*, No. 20-12378, 2021 U.S. Dist. LEXIS 129573 (E.D. Mich. July 13, 2021). In that case, the court rejected the plaintiff's argument and explained why the plaintiff's claim took "footnote 7 out of context." *Id.* at 17. The court's explanation is as follows:

Footnote 7 appears in a section of the Supreme Court's Opinion addressing, and rejecting, Duguid's counterargument that the phrase "using a random or sequential number generator" modifies only "produce," and not "store." *Facebook*, 141 S. Ct. at 1171. The Court used the line quoted by Plaintiff to explain how an autodialer might both "store" *and* "produce" randomly or sequentially generated phone numbers, citing to an amicus curiae brief from the Professional Association for Customer Engagement for support. *Id.* at 1171-72 (explaining that while "it is odd [as a matter of ordinary parlance] to say that a piece of equipment 'stores' numbers using a random number 'generator,'" "it is less odd as a technical matter"). The Court referred to 1988 "devices that used a random number generator to store numbers to be called later (as opposed to using a number generator for immediate dialing)." *Id.* at 1172. Footnote 7 follows the reference to that 1988 equipment. **Thus, the "preproduced list" of phone numbers referenced in the footnote was itself created through a random or sequential number generator.** *Id.* at 1172 n.7. *See Hufnus*, 2021 U.S. Dist. LEXIS 118325, 2021 WL 2585488, at *1 (noting that the amicus brief "makes clear that the 'preproduced list' of phone numbers referenced in the footnote was itself created through a random or sequential number generator"); *Timms v. USAA Fed. Sav. Bank*, No. 3:18-cv-01495, 2021 U.S. Dist. LEXIS 108083, 2021 WL 2354931, at *6 (D.S.C. June 9, 2021) (noting the amicus brief "explained that the 1988 technology functions, in part, by creating an 'array' or list of telephone numbers that is sequentially generated and stored" and "[i]n a separate step, the equipment randomly generates a number"). **Thus, the Supreme Court is discussing the process as explained in the amicus brief in footnote 7, in which the "preproduced list" is one that is "sequentially generated and stored."**

*Id.* at *17-19 (emphasis added). Put simply, the *Barry* court reasoned that a preproduced

list that is not sequentially generated or stored cannot be considered an ATDS under the TCPA. In accordance with this interpretation, the *Barry* court found the plaintiff's reliance on footnote 7 to be misplaced because the preproduced list in dispute was not alleged to have been "sequentially generated or stored" like the one discussed in footnote 7. *Id.* at 19.

The same is true here. There is no evidence to suggest that the predetermined lists provided to LiveVox by FNBO were "sequentially generated or stored." Rather, as explained by Paul Osborne ("Osborne"), Director of Recovery at FNBO, FNBO's predetermined lists are created as follows:

- Each day, FNBO's TWX system generates a file of accounts that are past due, and therefore, eligible to be called. [R. 32–11, Ex. 12, p. 18, 17:16–18].

- That file is then sent to the LiveVox System, where FNBO's administrators work with the files to develop calling campaigns and strategies based on different criteria, such as "delinquency, balances, other types of segmentation, from time zones, and so forth." *Id.* at 22, 21:7–13. While developing campaign strategies, FNBO's administrators determine the numbers to be called and the order in which the numbers are to be called. *Id.* at 34–35, 38–40, 33:11–34:10, 38:11–40:5.

- The LiveVox system then uses the FNBO administrators' predetermined lists to call the designated customers. [R. 31–1, Ex. A, p. 3, ¶ 14].

Such process makes evident that the predetermined lists used by LiveVox are not "sequentially generated or stored," but are crafted and provided daily to LiveVox by FNBO's administrators. As a result, and just like in *Barry*, Barnett's reliance on footnote 7 is misplaced. *See* 2021 U.S. Dist. Lexis 129573, at *19.

Further, the Court is not persuaded by Barnett's argument that LiveVox is an ATDS simply because it has the "*capacity* to store telephone numbers using a random or sequential number generator, and then to dial those numbers without human intervention

…" [R. 32, p. 15] (emphasis added). The Executive Vice President of Product Development for LiveVox, Laurence Siegel, declared that, "LiveVox's systems have *never had the capacity* to use a random or sequential number generator to either store or produce phone numbers to be called." [R. 31–4, p. 3, ¶ 5] (emphasis added). As Siegel's statement was declared under the penalty of perjury, and Barnett offers no evidence to the contrary or to suggest he lied or misrepresented LiveVox's capabilities, the Court regards his statement as true. Consequently, Barnett has failed to meet his burden of producing "specific facts" showing a "genuine issue" for trial. *Celotex*, 477 U.S. at 324; *see also Flagg ex rel. J.B. v. City of Detroit*, 827 F. Supp.2d 765, 774 (E.D. Mich. 2011) (quoting Fed. R. Civ. P. 56(e)(2)) ("Rule 56 itself … dictates … that the nonmoving party 'may not rely merely on allegations or denials in its own pleading,' but 'must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial."); *Cunningham v. Holder*, 842 F. Supp.2d 338, 341 (D.D.C. 2012) (On a summary judgment motion, "[f]actual assertions in the moving party's affidavits and declarations may be accepted as true unless the opposing party submits his own affidavits, declarations, or documentary evidence to the contrary.").

In any event, even if LiveVox did have the capacity to store telephone numbers using a random or sequential number generator, as Barnett claims, capacity alone is not enough to establish liability under the TCPA. *See* [R. 32, p. 15].[1] "The TCPA prohibits the

---

[1] In support of his argument, Barnett cites to several cases. [R. 32, pp. 13, 15]. The majority of the cases were decided before *Duguid*, which resolved a circuit split regarding what qualified as an ATDS under the TCPA. Consequently, the Court will not address them here. However, Barnett also cited to *Williams v. Schanck*, which was decided after *Duguid*. No. 5:15–cv–01434–MHH, 2021 U.S. Dist. LEXIS 116218 (N.D. Ala. June 22, 2021); *see also* [R. 32, p. 15]. Nonetheless, the case is not applicable here since the district court did not undergo an ATDS analysis in accordance with *Duguid* because the defendant did not withdraw his previous, pre–*Duguid* admission that the telephone system was an ATDS even after the court offered him an opportunity to do so in light of *Duguid*'s ruling. As a result, whether the system is actually an ATDS will be determined by the appellate court, if the matter is ever appealed. 2021 U.S. Dist. LEXIS 116218 *11–12 n. 4.

unlawful 'use' of an ATDS to 'make any call,' not simply the existence of such systems." *Barry*, 2021 U.S. Dist. LEXIS 129573, at *11 (internal citations omitted); *see also* 47 U.S.C. § 227. Stated differently, a system violates the TCPA when it uses a random or sequential number generator to contact customers, not simply because it has the potential to store telephone numbers using a random or sequential number generator. This was made clear by the Supreme Court in *Duguid*, which states that, "Congress' definition of an autodialer requires that, *in all cases*, whether storing or producing numbers to be called, the equipment in question *must use* a random or sequential number generator." 141 S. Ct. at 1170 (emphasis added); *see also McEwen v. Nat'l Rifle Ass'n of Am.*, No. 2:20–cv–00153–LEW, 2021 U.S. Dist. LEXIS 72133, at *7 (D. Me. Apr. 14, 2021) ("After the *Duguid* opinion, the ATDS portion of the claim requires an allegation that InfoCision used a random or sequential number generator to place a call to Plaintiff's cellphone, not merely a claim that its dialing system has that capability.").

Here, FNBO has made clear that it did not use LiveVox to store (or produce) telephone numbers using a random or sequential number generator to call Barnett's cell phone. *See* [R. 31, p. 11; R. 31–1, Ex. A, p. 3, ¶ 15; R. 31–4, Ex. D, p. 3, ¶ 5; R. 35, p. 3]. To accept Barnett's claim that FNBO's LiveVox system must only be capable of using a random or sequential number generator, even though such capability was never used, "would have the effect of imposing liability on a defendant whenever it has such a system, with admittedly no nexus to the alleged harm to the plaintiff." *Barry*, 2021 U.S. Dist. LEXIS 129573, at *11. The Court declines to impose such liability here. Accordingly, under both the TCPA and *Duguid*, FNBO did not contact Barnett via an ATDS.

Notwithstanding, Barnett's argument that "calls made using an artificial or prerecorded voice are independently actionable from calls made using an ATDS" has merit. [R. 32, p. 12]. Under the TCPA, a plaintiff may recover damages for calls made "using any [ATDS] *or* an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A) (emphasis added). Thus, calls made using an artificial or prerecorded voice are independently actionable from calls made using an ATDS. *See Duguid*, 141 S. Ct. at 1173 (citing 47 U.S.C. §§ 227(b)(1)(A) and (B)) ("The statute *separately* prohibits calls using 'an artificial or prerecorded voice to various types of phone lines, including … cell phones[.]") (emphasis added); *Whitehead v. Ocwen Loan Servicing, LLC*, No. 2:18–cv–470–FtM–99MRM, 2018 U.S. Dist. LEXIS 182386, at *12 (M.D. Fla. Oct. 24, 2018) ("[E]ven if Plaintiff had failed to state a claim regarding [defendant's] use of an ATDS, her TCPA claim would proceed based on her allegation that [defendant] used an artificial or prerecorded voice."); *Jones v. Safe Sts. USA LLC*, No. 5:19–CV–394–BO, 2020 U.S. Dist. LEXIS 105364, at *7 (E.D.N.C. June 16, 2020) ("Calls made using an artificial or prerecorded voice are independently actionable from calls made using an ATDS."); *Swope v. Credit Mgmt., L.P.*, No. 4:12–CV–832–CDP, 2013 U.S. Dist. LEXIS 21991, at *12 (E.D. Mo. Feb. 19, 2013) (quoting 47 U.S.C. § 227(b)(1)(A)) ("From the plain text of the statute, each of these violations is independently actionable; plaintiff may recover damages for calls made 'using any [ATDS] *or* an artificial or prerecorded voice.'"). Barnett claims that out of the 574 times FNBO contacted him via his cell phone, 111 of those times were "prerecorded message[s] or … predetermined text message[s]." [R. 32, p. 15].  In its Reply, FNBO does not address, let alone counter, this argument. *See* [R. 35]. Consequently, the Court will treat the matter as undisputed, *see* Fed. R. Civ. P. 56(e)(2), and proceed to analyze the remaining factor of consent as it pertains to the 111 prerecorded messages.

### ii. Consent

The Federal Communications Commission ("FCC") is charged by statute with "prescrib[ing] regulations to implement the requirements of" the TCPA. 47 U.S.C. § 227(b)(2). In 2007, the FCC ruled that "the provision of a cell phone number to a creditor, *e.g.*, as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at the number regarding the debt." *In re Rules Implementing the Tel. Consumer. Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 564 (F.C.C. December 28, 2007) (emphasis in original). The Sixth Circuit adheres to the FCC's ruling. *See Hill v. Homeward Residential*, 799 F.3d 544, 551–552 (6th Cir. 2015) ("A debtor consents to calls about 'existing debt' when he gives his number 'in connection with' that debt … [A] person gives his 'prior express consent' under the [TCPA] if he gives a company his number before it calls him.") (internal quotations and citations omitted). The defendant bears the burden of establishing prior consent. *Pugliese*, 2010 U.S. Dist. LEXIS 64111, at *19 (citation omitted).

FNBO argues that Barnett consented to contact about his missed payments when he provided FNBO his cell phone number when applying for the Account. [R. 31, p. 8; R. 35, pp. 1–2]. Barnett claims that since FNBO "has not produced the relevant credit application" then FNBO cannot prove that Barnett consented to FNBO's calls. [R. 32, p. 9].  However, upon review of the record, the Court finds Barnett's argument to be unconvincing. In his deposition, Barnett testified that he provided FNBO his cell phone number when he applied for the Account. [R. 31–2, p. 4 at 12:22–13:4]. In addition, Osborne testified to Barnett's provision of his cell phone number in connection with the Account. [R. 31–1, Ex. A, p. 2, ¶ 6]. These testimonies, which were given under oath, are sufficient under both the FCC ruling and Sixth Circuit law to establish consent. *See* 23 F.C.C. Rcd. at 564; *Hill*, 799 F.3d at 551–552. Thus, because Barnett

provided FNBO with his cell phone number when he created the Account, Barnett consented to being contacted by FNBO.  The question now becomes whether Barnett ever revoked his consent.

The TCPA is "silent on whether and how a consumer may revoke previously–granted consent." *Ammons v. Ally Fin., Inc.*, 326 F. Supp.3d 578, 591 (M.D. Tenn. June 27, 2018). The Sixth Circuit has also not addressed the method and timing of revocation under the TCPA. *Id.* at 592. However, in 2015, the FCC ruled that "[c]onsumers have a right to revoke consent, using any reasonable method including orally or in writing." *In re Rules & Regulations Implementing the TCP Act of 1991 et al.*, 30 F.C.C. Rcd. 7961, 7996 ¶ 64 (F.C.C. July 10, 2015) (hereinafter "2015 FCC Ruling"). In further clarification of the matter, the 2015 FCC Ruling also stated that the TCPA does require "that the called party *clearly express* his or her desire not to receive further calls." *Id.* at 7997 ¶ 67 (emphasis added). In determining whether a consumer's revocation is reasonable, the FCC looks to:

> the totality of the facts and circumstances surrounding that specific situation, including, for example, whether the consumer had a reasonable expectation that he or she could effectively communicate his or he request for revocation to the caller in that circumstance, and whether the caller could have implemented mechanisms to effectuate a requested revocation without incurring undue burdens.

*Id.* at 7996 n. 233. District courts within the Sixth Circuit have followed the 2015 FCC Ruling with regard to consent revocation under the TCPA. *See Currier v. PDL Recovery Grp. LLC*, No. 14–12179, 2017 U.S. Dist. LEXIS 25240, at *23–25 (E.D. Mich. Feb. 23, 2017); *Ammons*, 326 F. Supp.3d at 591–601; *Rodriguez v. Premier Bankcard, LLC*, No. 3:16–CV–2541, 2018 U.S. Dist. LEXIS 149225, at *34 (N.D. Ohio Aug. 31, 2018). Thus, the Court will also analyze revocation as outlined in the 2015 FCC Ruling. Viewing the

totality of the circumstances, the Court finds a genuine dispute with regards to Barnett's revocation of consent.

In support of his argument that he revoked his consent, Barnett points to the following evidence: (1) deposition testimony in which he testified that he told FNBO to not call him on multiple occasions, [R. 31–2, Ex. B, p. 5, 20:1–5]; (2) audio recordings of conversations between Barnett and FNBO representatives in which Barnett instructed the FNBO representatives to mail his billing statements and/or hung up prior to the natural conclusion of the call, [R. 32, Exs. 4–10]; and (3) an official log produced by FNBO of all the calls and texts made by FNBO to Barnett from March 2019 to October 2019, which provides numerous details as to the form and reception of the type of contact made, [R. 32–13, Ex. 13].[2] In response, FNBO contests every aspect of Barnett's revocation claim, including whether he provided a "clear revocation" and his "bizarre interpretation" of the recorded calls. *See* [R. 31, pp. 9–10; R. 35, pp. 3–4]. However, upon review of the entire record, and viewing the evidence in the light most favorable to Barnett, the Court finds that the parties' unresolved contentions illustrate that whether Barnett revoked his consent clearly remains a disputed issue of fact. *See Ammons*, 326 F. Supp.3d at 600 (quoting *Thompson v. Louisiana*, 469 U.S. 17, 23 (1984)) ("However, the 'issue of consent is ordinarily a factual issue.'").

First, "prior express consent under the TCPA is revocable via an oral statement on the phone." *Gold v. Ocwen Loan Servicing, LLC*, No. 2:17–cv–11490, 2017 U.S. Dist. LEXIS 203650, at *5 (E.D. Mich. Dec. 12, 2017); *see also Osorio v. State Farm Bank,*

---

[2] In his deposition, Barnett claimed to have a handwritten log where he documented an occasion where he told an FNBO representative not to call him. [R. 31–2, Ex. B, pp. 5–6, 23:17–24:11]. However, the log has not been produced in discovery and placed in the record. Consequently, the Court will not rely on it in making its determination on the issue of consent.

*F.S.B.*, 746 F.3d 1242, 1254–56 (11th Cir. 2014) (explaining that called parties may revoke their consent orally); *In re Rules & Regulations Implementing the TCP Act*, 30 F.C.C. Rcd. at 7996 ¶ 64 ("Consumers have a right to revoke consent, using any reasonable method including orally or in writing."). Barnett testified unequivocally in his deposition that on multiple occasions he told FNBO not to call him. *See* [R. 31–2, Ex. B, p. 5, 20:1–5; R. 32–3, pp. 3–4, 14:17–15:14]. FNBO contends that Barnett never revoked his consent to being contacted by FNBO and points to several recorded calls between Barnett and FNBO collectors in which, they argue, Barnett never clearly revoked consent. *See* [R. 31, pp. 8–10; R. 35, pp. 2–3]. Barnett counters that based on the totality of the circumstances, the calls support his deposition testimony. [R. 32, p. 5]. Specifically, Barnett argues a reasonable jury could conclude he revoked consent by expressly directing FNBO collectors to put anything they had to say in the mail and repeatedly hanging up on them. *Id.* The Court notes that only a fraction of the recorded calls between Barnett and FNBO collectors have been placed in the record. During Paul Osborne's deposition, it was determined that FNBO's call log indicated that about twenty-four calls were recorded, *see* [R. 32–11, p. 82, 81:18–23], but only seven recorded calls were placed in the record. [R. 32, Exs. 4–10].

Further, FNBO's official call log causes the Court to question Philadelphia's claim that Barnett *never* revoked his consent. [R. 31, p. 10]. Specifically, the log demonstrates that on two separate occasions LiveVox left a "partial message only" for Barnett. [R. 32–13, Ex. 13, p. 8]. When questioned as to what this meant, Osborne testified that one possibility could be that Barnett answered the call only to hang up prior to the completion of the message. [R. 32–11, Ex. 11, pp. 79–80, 78:8–80:10]. The log also shows that on one distinct occasion, Barnett explicitly refused to speak with a FNBO representative and hung

14

up on the call. [R. 32–13, Ex. 13, p. 10, call on 2019/08/19 at 15:29:09]; *see also* [R. 32–11, Ex. 11, pp. 81, 80:11–25]. Finally, the FNBO log also reflects that no conversations were documented between Barnett and FNBO collectors for the last several months that FNBO continued to call Barnett – that is, after the first couple months of FNBO calling Barnett, Barnett never again took FNBO's calls and engaged in conversation. *See* [R. 32, Ex. 13].

A plaintiff's deposition testimony alone may be sufficient to create a genuine issue of material fact. *See Moran v. Al Basit LLC*, 788 F.3d 201, 205 (6th Cir. 2015) ("This appeal raises one simple question: Where Plaintiff has presented no other evidence, is Plaintiff's testimony sufficient to defeat Defendant's motion for summary judgment? We hold that it is."). Other courts have declined to grant a lender's summary judgment motion in a TCPA case based on evidence similar to that presented here. In *Moorman v. Bluestem Brands*, No. CV 16–04835 TJH (RAOx), 2017 U.S. Dist. LEXIS 228642, at *2–3 (C.D. Cal. Oct. 13, 2017), the court found plaintiff's sworn deposition and declaration, attesting she orally revoked consent, sufficient to create a genuine issue of fact precluding summary judgment. Although the *Moorman* plaintiff's recollection concerning when she revoked consent was imprecise, the court noted that "[t]hroughout this case, [plaintiff] has consistently maintained that she, at some point, revoked her consent." *Id.* at 3. Similarly, in *Smith v. MarkOne Fin., LLC*, No. 3:13–cv–933–J–32MCR, 2015 U.S. Dist. LEXIS 11803, at *9–10 (M.D. Fla. Feb. 2, 2015), the court denied the lender's summary judgment motion based on plaintiff's testimony that she told the lender to stop calling her every time that it called and that she noted as much in a personal call log. Accordingly, the court

reasoned, "there is an issue of material fact as to whether and when [plaintiff] revoked [her] consent." *Id.* at 10.

In this case, Barnett testified that he instructed FNBO over the phone to stop calling him. Although a plaintiff's deposition testimony alone may be sufficient to create a genuine issue of material fact, *see Moran*, 788 F.3d at 205, the Court need not rely on Barnett's deposition testimony alone. As outlined above, there is additional evidence in the record that a reasonable jury could construe as corroborating Barnett's deposition testimony – that is, the recorded calls where Barnett instructs the collector to put any information in the mail and hangs up the phone prior to its natural conclusion; the call log of August 19, 2019, detailing Barnett specifically refused to talk with the collector and hung up the phone; and the fact that no additional conversations between Barnett and FBNO collectors are reflected on the call log for the last several months of FNBO's attempts to contact him (from which one could reasonably infer Barnett refused to answer FNBO's calls). The Court may not "weigh the evidence," *Anderson,* 477 U.S. at 265, and must draw all reasonable inferences from the facts in favor of Barnett. *Matsushita,* 475 U.S. at 587. Under this standard, Barnett has raised a triable issue of fact because the evidence could lead reasonable minds to differ as to whether Barnett expressly revoked his prior consent to be contacted by FNBO. FNBO's Motion for Summary Judgement is, therefore, denied as to the 111 prerecorded calls and messages.

### B.  The Kentucky Consumer Protection Act[3]

---

[3] In his Response, Barnett briefly cites to the Fair Debt Collection Practices Act ("FDCPA") and states that, "Defendant's calling was unfair and unconscionable under the KCPA because Defendant's calling would be a violation of the FDCPA." [R. 32, p. 16]. However, Barnett does not make any argument beyond that bald statement. Further, he does not bring a FDCPA claim against FNBO, which is a separate cause of action from a KCPA claim. As such, the Court will not address Barnett's unclear and underdeveloped assertion regarding the FDCPA.

16

In Count II of his Complaint, Barnett claims FNBO violated the KCPA. [R. 1, p. 6, ¶¶ 41–44]. FNBO, however, does not provide the Court with a developed counterargument to this claim in either its Motion for Summary Judgment or Reply. Instead, FNBO merely argues that it did not violate the KCPA because Barnett never revoked his consent for FNBO to contact him regarding his debt. [R. 31, p. 12; R. 35, pp. 5–6]. Nonetheless, for the reasoning provided below, Barnett's KCPA claim fails as a matter of law.

The KCPA is designed "to protect the public interest and the well–being of both the consumer public and the ethical sellers of goods and services." Ky. Rev. Stat. § 367.120. "It provides a cause of action to those who believe they have been harmed in violation of the Act." *Suhail v. Univ. of the Cumberlands*, 107 F. Supp.3d 748, 757 (E.D. Ky. May 28, 2015). Pursuant to the statute,

> [a]ny person who purchases … goods or services primarily for personal, family, or household purposes and thereby suffers any *ascertainable loss of money or property*, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170, may bring action … to recover actual damages.

Ky. Rev. Stat. § 367.220 (emphasis added). The Act defines "unlawful acts" as those that are "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. § 367.170. "Unfair" is further defined as unconscionable. *Id.*

In his Complaint, Barnett asserts that FNBO's persistent calling caused him to sustain "actual damages, including but not limited to, stress, anxiety, embarrassment, severe emotional and mental pain and anguish," but fails to point to any "ascertainable loss of money or property." [R. 1, p. 5, ¶ 36]; Ky. Rev. Stat. § 367.220. No Kentucky court has concluded that plaintiffs are entitled to mental suffering or emotional distress damages under the KCPA. *Peacock v. Damon Corp.*, 458 F. Supp.2d 411, 420 (W.D. Ky. 2006); *see*

17

*also Ind. Ins. Co. v. Demetre*, 527 S.W.3d 12, 34 (Ky. 2017) (where the court declines to "reach the question of whether damages for emotional distress could constitute an 'ascertainable loss of money or property' under the [KCPA]"). As a result, federal courts applying Kentucky law have declined to allow such damages under the KCPA. *See Peacock*, 458 F. Supp.2d at 420 (where the court declined to conclude that the KCPA allowed for mental suffering or emotional distress damages under the KCPA); *see also Virnig v. Td Bank United States*, Civil Action No. 3:18–cv–824, 2020 U.S. Dist. LEXIS 255071, at *6–7 (W.D. Ky. Aug. 13, 2020) (where the plaintiff's KCPA claim was dismissed because she only alleged emotional distress damages); *Minter v. Liberty Mut. Fire Ins. Co.*, No. 3:11–cv–00249–S, 2014 U.S. Dist. LEXIS 137741, at *18 (W.D. Ky. Sep. 30, 2014) ("It is clear that the KCPA does require proof that the plaintiff suffered an actual injury."); *Pagliara v. Johnston Barton Proctor & Rose, LLP*, 708 F.3d 813, 820 (6th Cir. 2013) (where the court recognizes that emotional distress is not sufficient to state a claim under the Tennessee Consumer Protection Act, which is nearly identical to the KCPA). Accordingly, because Barnett only alleges that FNBO's persistent calling caused him emotional distress, and not loss of money or property, his KCPA claim fails as a matter of law. FNBO's Motion for Summary Judgment as to Count II is granted.

## C.  Intrusion Upon Seclusion

Barnett asserts that FNBO called him 574 times over a seven-month period, and that such "hounding" constitutes an intrusion upon seclusion. [R. 32, pp. 17–18]. In its Motion for Summary Judgment, FNBO argues that it never invaded Barnett's privacy because Barnett never revoked his consent to be called, and thus, it was proper for FNBO to "merely" call Barnett about his "delinquent account." [R. 31, p. 12]. However, FNBO fails to cite to a single case in

support of its argument. *See id.* Further, FNBO did not even mention, let alone counter, Barnett's intrusion upon seclusion argument in its Reply. *See* [R. 35].

For invasion of privacy claims, Kentucky applies the principles articulated in the Second Restatement of Torts § 652B (1976). *See McCall v. Courier–Journal & Louisville Times Co.*, 623 S.W.2d 882, 887 (Ky. 1981). The Restatement provides as follows:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B. What elements are required to meet this standard, however, are unclear. *See Smith v. Bob Smith Chevrolet, Inc.*, 275 F. Supp.2d 808, 821 (W.D. Ky. 2003) ("Other than summarily adopting intrusion upon seclusion as a cause of action, no Kentucky court in a published opinion has explained in any detail the elements required to meet this standard."). Federal courts interpreting the Restatement's standard of intrusion upon seclusion have tracked the Restatement's guidance and concluded that "the standard for 'intrusion upon seclusion' is an 'intentional intrusion, physical or otherwise, upon the solitude or seclusion of another … if the intrusion would be highly offensive to a reasonable person.'" *Id.* at 822 (citing Restatement (Second) of Torts § 652B).

Thus, to prevail on his claim for intrusion upon seclusion, Barnett must show "(1) an intentional intrusion by [FNBO], (2) into a matter [he] has a right to keep private, (3) which is highly offensive to a reasonable person." *Id.* (citations omitted). Whether excessive calls rise to the level of intrusion upon seclusion is a fact–specific inquiry. *Virnig*, 2020 U.S. Dist. LEXIS 255071, at * 9 (citation omitted). "And '[t]he threshold of when the number of calls becomes so persistent and frequent as to constitute "hounding" is not clearly delineated.'" *Id.* (quoting *Charvat v. NMP, LLC*, 656 F.3d 440, 454 (6th Cir. 2011)).

Cases in the Sixth Circuit have denied summary judgment on intrusion upon seclusion claims involving far fewer calls than at issue here. In *Virnig*, the court found that 79 phone calls over a 65–day period, which is equivalent to roughly two months, was sufficient to preclude summary judgment on the plaintiff's invasion of privacy claim. 2020 U.S. Dist. LEXIS 255071, at *7–9. The court reached its conclusion by relying on *Hoffman v. GC Servs. Ltd. P'ship*. *Id.* at 9. The *Hoffman* court, in analyzing Tennessee's adoption of Restatement § 652B, determined that 75 phone calls in a six–month period was sufficient enough to preclude summary judgment. No. 3:08–cv–255, 2010 U.S. Dist. LEXIS 139509, at *63 (E.D. Tenn. Mar. 3, 2010).

Here, Barnett has provided evidence that FNBO made 574 calls, including text messages and voicemails, over a seven–month period. *See* [R. 32–13, Ex. 13]. That means, on average, FNBO called Barnett about *82 times per month*, *or about 3.2 calls per day* (excluding Sundays), for a seven-month period. Cumulatively, FNBO called Barnett more times (on average) *each month* than the total amount of calls made over several months in both *Virnig* and *Hoffman*. That alone is sufficient to preclude summary judgment. *See Virnig*, 2020 U.S. Dist. LEXIS 255071, at *7–9; *Hoffman*, 2010 U.S. Dist. LEXIS 139509, at *63. Though FNBO defends this claim solely on the basis that Barnett never revoked consent to the calls, *see* [R. 31, p. 12], the Court has already found that whether Barnett revoked his consent to be contacted by FNBO remains a genuine issue of dispute. *See supra* Section III.(A)(ii). Accordingly, whether FNBO's conduct amounted to a "course of hounding" remains a question for the jury. *See Hoffman*, 2010 U.S. Dist. LEXIS 139509, at *61 (citing Restatement (Second) of Torts § 652B cmt. d) ("[A] plaintiff may have an actionable claim for intrusion upon seclusion if he can demonstrate that the phone calls made by debt collectors were made with 'such frequency as to amount to a course of hounding the plaintiff …'"). FNBO's Motion for Summary Judgment as to Count III is denied.

20

Because the Court has concluded that Barnett's KCPA claim in Count II is precluded as a matter of law, *see* discussion *supra* Section III.B., and has denied summary judgment as to his intrusion upon seclusion claim in Count III, the Court finds that a hearing on the two issues is not required. Thus, Barnett's request for a hearing on these matters, *see* [R. 32, p. 2], is denied.

## IV.    Conclusion

For the reasons stated above, FNBO's Motion for Summary Judgment is denied in part and granted in part. Accordingly, **IT IS HEREBY ORDERED** as follows:

1.  Defendant First National Bank of Omaha's Motion for Summary Judgment, [R. 31], is **GRANTED IN PART** and **DENIED IN PART**.

    a.  The Motion is **DENIED** as to Count I with respect to the 111 prerecorded calls and text messages.

    b.  The Motion is **GRANTED** as to Count I with respect to all calls other than the 111 prerecorded calls and text messages.

    c.  The Motion is **GRANTED** as to Count II.

    d.  The Motion is **DENIED** as to Count III.

This the 3rd day of March, 2022.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF KENTUCKY

21